In re Margaret Ann GIBSON, Debtor.

In re Allen George HILTON, Georgene (NMN) Hilton, Debtors.

In re Toni Lee WOLFE a/k/a Toni L. Wolfe, Debtor.

In re Edwin Jerry STUPKA, Jr., a/k/a Edwin Jerry Stupka, Jr., Debtor.

In re Charlz Lloyd WALWYN, f/d/b/a Angels Fantasy Factory, Debtor.

In re Danny Eugene MORROW, Kathleen Ann Morrow f/d/b/a Morrow Glass f/d/b/a Morrow Rentals f/d/b/a El Dorado Truck Wash, Debtors.

Bankruptcy Nos. 81–40359, 81–10235, 81–40301, 81–10276, 81–40613 and 81–11147.

United States Bankruptcy Court, D. Kansas.

Dec. 21, 1981.

258

Roger L. Hiatt, Hiatt, Hiatt & Carpenter, Chtd., Topeka, Kan., for debtors.

Wilburn Dillon, Jr., Tilton, Dillon, Beck & Crockett, Topeka, Kan., for Postal Finance Co.

Lloyd C. Swartz, Topeka, Kan., Trustee.

David M. Arnold, Wichita, Kan., for debtors.

Jerold E. Berger, Topeka, Kan., Trustee.

Frank A. Caro, Wichita, Kan., for debtors.

Paul M. Buchanan, Wichita, Kan., for Citizens State Bank of Grainfield.

Roberta Sue Hawver, Hawver & Irigonegaray, P. A., Topeka, Kan., for debtors.

Joseph I. Wittman, Topeka, Kan., for Finance America Corp.

Malcolm C. Black, Wichita, Kan., for Beneficial Finance Co.

Christopher J. Redmond, Wichita, Kan., Trustee.

Kermit M. Beal, Lawrence, Kan., for debtors.

William B. Pendleton, Lawrence, Kan., for C.F.C.A. Employees Credit Union.

Cary L. Standiferd, Topeka, Kan., Trustee.

Donald B. Clark, Wichita, Kan., for debtors.

Michael G. Coash, Bond, Bond & Coash, El Dorado, Kan., for Citizens State Bank of El Dorado.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

In each of six cases, the debtors seek to avoid liens attaching to sundry household goods arising out of a series of notes, renewed notes and security interests given in return for loans from the creditor executed before the effective date of the Code. In each case, the final renewal note was executed after the effective date of the Code. In some cases, money advanced in the notes or renewed notes was used to purchase property in which the creditor then took a security interest.

In *In Re Gibson*, the debtor is represented by Roger L. Hiatt of Hiatt, Hiatt & Carpenter, Chartered, Topeka, Kansas. The creditor is represented by Wilburn Dillon of Tilton, Dillon, Beck and Crockett, Topeka, Kansas.

In *In re Hilton*, the debtors are represented by David M. Arnold, Wichita, Kansas. The creditor is represented by Malcolm C. Black, Wichita, Kansas.

In *In Re Wolfe*, the debtor is represented by Kermit M. Beal, Lawrence, Kansas. The creditor is represented by William B. Pendleton, Lawrence, Kansas.

In *In Re Stupka*, the debtor is represented by Frank A. Caro, Wichita, Kansas. The creditor is represented by Paul M. Buchanan, Wichita, Kansas.

In *In Re Walwyn*, the debtor is represented by Roberta Sue Hawver of Hawver & Irigonegaray, Topeka, Kansas. The creditor is represented by Joseph J. Wittman of Topeka, Kansas.

In *In Re Morrow*, the debtors are represented by Donald B. Clark, Wichita, Kansas. The creditor is represented by Michael G. Coash of Bond, Bond & Coash, El Dorado, Kansas.

These cases are joined for decision. Each case is a lien avoidance question under § 522(f). As developed, however, the cases encompass the full panoply of questions as to the effect that post-Code renewal, add on money, add on collateral and cross collateralization has on pre-Code purchase and non purchase money loans.

The issues presented are:

1. Can a debtor constitutionally avoid a security interest that attaches before the effective date of the Bankruptcy Code under 11 U.S.C. § 522(f).

2. Does a renewal note owing after the effective date of the Bankruptcy Code extinguish the original note and security interest and create a new, separate and distinct obligation and security interest.

3. Do add on or cross collateralization clauses destroy a creditor's purchase money status.

The parties have submitted legal memoranda and the matter is ready for determination.

### FINDINGS OF FACT

In each of the following Code cases, collateral of the nature described under § 522(f)(2) was pledged as security by the debtor, and a cross collateralization agreement was signed.

*In Re Gibson* (Case No. 81–40359)

On July 26, 1976 Postal Finance Company, Inc. loaned debtor $943.47 at an annual interest rate of 27.95%. Debtor pledged as security for repayment of the debt the following items of personal property:

Plaid green and white cloth sofa; Zenith portable television; Whirlpool green elec-

tric stove; Whirlpool green refrigerator; white Maytag washing machine; white Maytag gas dryer; twin size bed with mattress and box springs; pink painted chest; double bed with mattress; walnut wood chest; walnut dresser.

A financing statement was filed on July 29, 1976 covering the same items of personal property, filing No. 256609, with the Register of Deeds of Shawnee County, Kansas.

Thereafter on at least six occasions prior to October 1, 1979 renewal notes were executed in which additional advances were made or collateral was added on or deleted.

On August 7, 1980 the creditor loaned the debtor a total of $1,598.31 at an annual interest rate of 26.71%, $1,233.41 was carried over from the July 23, 1979 loan. A total of $364.90 in cash was then advanced to the debtor. The same items of personal property were pledged as security for repayment of the debt. Set forth in the Disclosure Statement is the following: "This statement of loan is rendered in connection with a *Master Loan Agreement* between the parties dated August 7, 1980 providing a maximum of credit of $1,600 and is a part thereof." The Master Loan Agreement was also executed on August 7, 1980.

On February 10, 1981 the creditor filed a Continuation Statement with the Shawnee County Register of Deeds, No. 330838.

On May 15, 1981 the debtor filed a petition and plan under chapter 13 of title 11 U.S.C. along with a complaint requesting avoidance of the creditor's security interest under 11 U.S.C. § 522(f). On June 3, 1981 the creditor filed an objection to avoidance of lien and a Motion to Stay Confirmation Pending Adjudication of Security Interest. The creditor also filed a Proof of Claim rejecting the debtor's plan and filed as a secured creditor.

The balance owed the creditor as of May 15, 1981 is $1,352.73. The creditor asserts that the security originally pledged by the debtor on July 26, 1976 as itemized above and continued through the transaction on August 7, 1980, is of a value equal to or greater than the balance owed creditor.

The debtor has valued the security at $1,000.

*In Re Hilton* (Case No. 81–10235)

On June 23, 1978 the debtors obtained a loan from Beneficial Finance Co. of New Mexico. The loan was paid by renewal on December 13, 1979. At that time the balance outstanding was $1,387.18. In conjunction with the renewal, an additional cash advance of $777.00 was made, and insurance was added, bringing the balance to $2,500.00. Finance charges of $772.43 were added bringing the total balance to $3,272.43. The debtors made payments of $832.17 before filing for bankruptcy. No new collateral was added in the renewal of December 13, 1979 and thus the new advance of $777.00 was not used to purchase any new collateral in which the creditor took a security interest.

*In Re Wolfe* (Case No. 81–40301)

A series of loans were made by C.F.C.A. Employees Credit Union to the debtor, with renewal notes executed, additional advances made and additional collateral pledged. The last renewal before the effective date of the Code was June 22, 1979. At that time $7,732.66 owing on the prior loan was carried over to the new loan, and an additional amount of $267.34 was advanced to the debtor.

One renewal note was executed after the effective date of the Code, on October 24, 1979. The sum of $6,233.88 was carried over from the prior loan and an additional $1,766.12 was advanced to the debtor. Additional collateral was pledged. The parties stipulated that the debtor used the $1,766.12 to purchase the following personalty in which the creditor took a security interest:

> 1979 King size bed
> 1979 Bar and 2 stools
> 1979 Coffee and end tables
> 1979 Love seat and chair
> 1979 Tilt-top table

The parties further stipulate that the following three items of additional collateral pledged in the renewal note after the effective date of the Code were existing household goods in which the creditor has a security interest:

Silver wine cooler
2 silver goblets
8 place silver setting

### In Re Stupka (Case No. 81–10276)

A loan was made before the effective date of the Code by the Citizens State Bank of Grainfield, Kansas to the debtor. On October 18, 1979, after the effective date of the Code, the loan, with an outstanding balance of $3,800, was renewed. No new cash was advanced, and no new collateral was added. The loan was secured by: equipment, supplies, accounts receivables of Stupka Construction, and a 1974 Chevrolet pickup truck. The debtor made one payment of $663.22, leaving a balance owing of $3,136.78. The parties have stated the records do not go back far enough to determine if the original loan and security interest was a purchase money interest. This determination is not necessary, however, to the Court's decision.

### In Re Walwyn (Case No. 81–40613)

On September 20, 1979 the debtor executed an unsecured installment note of $1,104.00 to Finance America Corp. (creditor). On July 10, 1980 the debtor borrowed an additional $501.63 from the creditor to purchase an Alpha Starr, Big Screen television with stand. In addition, the creditor "paid" the unsecured note and added the balance of it onto the July 10, 1980 note. The total balance of the new note was $1,049.91. A security agreement in connection with the new note was executed granting a security interest in the television and a financing statement perfecting the creditor's interest was filed on July 10, 1980 in the Shawnee County, Kansas Register of Deeds.

The debtor made 11 payments on the July 10, 1980 note. The balance due is $764.60, but the Court was not presented with evidence of a list of the payments made by the debtor.

### In Re Morrow (Case No. 81–11147)

The debtors executed a security agreement in conjunction with a note in favor of the creditor, Citizens State Bank of El Dorado, Kansas, on October 16, 1978.

The security agreement pledged as collateral "All Equip., Machinery, inventory, accounts Receivable, Vehicles, now owned or thereafter acquired—including but not limited to the attached list." The attached list, written under the letterhead of "Morrow Glass Company," set out a number of pieces of equipment, 1 vehicle, machinery, and possibly some inventory.

The creditor advanced $33,000 at an annual interest rate of 10%.

The note was renewed on December 15, 1979. No new cash advances were made, and the same all encompassing pledge of security was recited.

The note was again renewed on August 26, 1980. No new cash advances were made and the same pledge of security was recited. This note was marked "Paid by Renewal, 5–5–81."

On August 5, 1981, the previous outstanding note was consolidated with another note under which the debtors owed $146,000. The same collateral was recited and the note with which it was consolidated was secured by real estate.

## CONCLUSIONS OF LAW

### I.

In *Rodrock v. Security Indus. Bank*, 642 F.2d 1193 (10th Cir. 1981) the court held 11 U.S.C. § 522(f) constitutionally cannot apply to liens attaching before the enactment date of the Bankruptcy Reform Act of 1978 (Code).

In *In Re Freeman, Wiederman and Keith*, Case Nos. 81–40074, 81–40258 and 81–10529, (D.Kan.1981), this Court held § 522(f) constitutionally cannot apply to liens attaching in the "gap" period between enactment of the Code and the effective date of the Code. Therefore, any lien attaching before the effective date of the Code, October 1, 1979, cannot be avoided under § 522(f). *In Re Freeman, supra*, at 4. Accord, *In Re Johnson*, 11 B.R. 909, 7 BCD 1017 (D.Bkrtcy., Kan.1981) (Morton, J.).

## II.

The next issue presented is whether renewal after the effective date of the Code of a note executed before the effective date operates to *extinguish* the old note and security interest and create a new note and security interest which constitutionally could be avoided under § 522(f).

Renewal of a note occurs as a regular business practice among sellers, finance companies and lending institutions. Briefly, the process involves an existing note that is "paid by renewal" or "flipped." The "new" or renewed note incorporates the balance still owing on the old note. Sometimes the renewal note merely extends the time of payment for the amount due on the old note. Other times a number of old notes are "consolidated" into one "new" note. Another practice is to renew an old note and give an additional cash advance in the renewal note, sometimes taking an additional security interest in new or different collateral. The variations are numerous, but in each instance, the paying of the old note by execution of a renewal note is generally just a bookkeeping procedure.

At least two bankruptcy courts have held the renewed note constitutionally could be avoided. *In Re Carnes*, 8 B.R. 599 (Bkrtcy., D.Okla.1981); *In Re Alston*, 11 B.R. 184 (Bkrtcy., W.D.Tenn.1981). Each court felt renewal extinguished the old note and security interest and created a new note and security interest. But see *Blue v. H–K Corp.*, 629 P.2d 790 (Okla.App.1981). They reasoned that since the new note and security interest were created after the effective date of the Code, constitutionally the lien could be avoided under § 522(f).

This Court disagrees with *Carnes* and *Alston* that on its face renewal of a note creates a new note and a new security interest. It believes that the following view derived from Am.Jur.2d Bills & Notes, § 915 at 958–60 (1963) is correct:

*Much diversity of opinion has been expressed as to the effect upon the original note or the debt represented thereby of the giving of a renewal note. In many jurisdictions it has been held that the*

*execution, or the mere execution, of a renewal note does not constitute a payment or discharge of the original note, but operates only as an extension of the time of payment ... On the other hand, some courts have held that a renewal of a note previously given by the same parties is not a continuation of a prior obligation, but is a new, separate, and distinct contract, and that a note given in renewal of a preceding note is presumed to be in payment of the original demand.*

*The true rule undoubtedly is that a new note may be given and accepted either merely to extend the time of payment of the old one or to discharge the old one by way of payment or novation, depending upon the intent of the parties and the agreement between them.*

In *In Re James*, 7 B.R. 73 (D.Me.1980) the debtor argued the first note and security interest securing the note were extinguished when a renewal note was executed. The court disagreed:

*The August 19 purchase price was not satisfied, but consolidated in a new note that remains unsatisfied. The consolidation was undoubtedly intended for the convenience of the parties ... (T)he September 27 consolidation constituted an extension of credit, not a satisfaction of debt. Id. at 75.*

In *Cantrill Construction Co. v. Canter*, 418 F.2d 705 (6th Cir. 1969), the court said a renewal note does not extinguish the original obligation and security interest unless there has been a novation, an intent to extinguish the original obligation. 418 F.2d at 706–07. Accord, *McGhee v. Story Bros., Inc.*, 295 F.2d 814 (6th Cir. 1961).

In *Thorpe Finance Corp. of Wisc. v. Ken Hodgins & Sons*, 73 Mich.App. 428, 251 N.W.2d 614 (1977), the court stated:

*The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement ... filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender had*

a perfected security interest in the collateral not only for the original debt but also for the later advance ... 251 N.W.2d 614, 618 (1977), quoting *James Talcott, Inc. v. Franklin Nat'l Bank of Minneapolis*, 292 Minn. 277, 291–92, 194 N.W.2d 775, 784 (1972). Accord, *In Re Nason*, 13 B.R. 984 (Bkrtcy., D.R.I.1981).

In *First National Bank of Clinton v. Julian*, 383 F.2d 329 (8th Cir. 1967) the court held where a note was *paid by renewal* the new note did not constitute a preferential payment of the old note because it is a *narrow and mistaken view to regard the new* [chattel] *mortgage as a transaction independent of the prior mortgage and the relations of the parties thereunder. Id.* at 334, quoting, *Schreiber v. Colt*, 80 F.2d 511 (10th Cir. 1935). Accord, *In Re All-Brite Sign Service Co., Inc.*, 11 B.R. 409, 7 BCD 844, 845 (Bkrtcy., W.D.Ky.1981).

In *Index Store Fixture Co. v. The Farmers' Trust Co.*, 536 S.W.2d 902 (Mo.App. 1976), the seller took a security interest in equipment sold on credit to the debtor, and filed a financing statement. Later the seller sold to the debtor additional equipment, executed a "new" note, and included in the "new" note a balance due from the original note. The court held the renewal and additional credit given in the "new" note did not extinguish the prior security interest.

Where renewal notes were executed with additional collateral given and additional credit or cash advances made, the court said:

> (T)he giving of a new note for a debt evidenced by a former note does not extinguish the original indebtedness unless such is the intention of the parties. *Bank of Austin v. Barnett*, 549 S.W.2d 428, 430 (Tex.Civ.Ct.App.1977).

Accord, *State Bank of Young America v. Vidmar Iron Works, Inc.*, 292 N.W.2d 244 (Minn.1980).

Kansas also follows this rule. In *Allis-Chalmers Credit Corp. v. Cheney Investment, Inc.*, 227 Kan. 4, 605 P.2d 525 (1980), a farmer bought a combine from an Allis-Chalmers dealer and granted a purchase money security interest to the dealer in the

combine. The dealer assigned the contract to the plaintiff and a financing statement was filed. The farmer later bought another combine from a different Allis-Chalmers dealer. The retail installment contract created the security interest, granted an interest in *both* combines, stated that the first note was paid off, and consolidated the balance owing on the first note into the second agreement. The district court found the second note cancelled the first note and the first security interest and was therefore an entirely new and separate agreement, creating an entirely new and distinct security interest.

The Kansas Supreme Court disagreed, holding, in effect, the second consolidating note did not extinguish the first note, 227 Kan. at 11, reasoning similarly to *In Re Southwest Pa. Natural Resources, Inc.*, 11 B.R. 900 (Bkrtcy., W.D.Pa.1981), where the court said:

> Even where the parties originally contemplate a single debt, secured by a single item of property, or a single group of items, the secured party and the debtor may enter into further transactions whereby the debtor obtains additional credit and the secured party is granted more security. The validity of such agreements as against creditors, trustees in bankruptcy and other secured parties has been widely recognized by many courts. 11 B.R. at 903, quoting Community Bank v. Jones, 22 U.C.C.Rep. 168 (D.Or.1977). Accord, Farmers State Bank of Oakley v. Cooper, 227 Kan. 547, 554, 608 P.2d 929 (1980); Fourth National Bank v. Hill, 181 Kan. 683, 695, 314 P.2d 312 (1957). See also Thorp Commercial Corp. v. Northgate Industries, Inc., 654 F.2d 1245 (8th Cir. 1981).

Synthesizing these cases, it becomes clear, excepting the effect of § 522(f), that when notes are renewed or consolidated or renewed coupled with the granting of additional credit, cash advances or collateral, the original note and security interest are not extinguished, unless the parties manifest such an intention. Thus the holdings in *In Re Carnes, supra*, and *In Re Alston,*

*supra*, appear to be contrary to the weight of authority and are rejected.

 A security interest attaches when the debtor signs a security agreement, value has been given, and the debtor has rights in the collateral. K.S.A. § 84–9–203(2) (Supp.1980). As the cases indicate, a renewal note does not extinguish the original note or security agreement, absent a novation. Therefore, a security interest that attached before the effective date of the Code is not extinguished by a renewal note executed after the effective date of the Code (absent a novation), and constitutionally cannot be avoided under § 522(f). *Rodrock v. Security Indus. Bank, supra*, and *In Re Freeman, supra*.

Discounting any purchase money aspects, the advancements of money or the addition of collateral in conjunction with a renewal note executed after the effective date of the Code, or attaching of security interests in after acquired property in which the debtor obtains rights after the Code's effective date, constitutionally *can* be avoided by the debtor because any interests the creditor has in the post-effective date advances or collateral did not *attach* until after the Code's effective date. See K.S.A. § 84–9–203 (Supp.1980). See also 11 U.S.C. § 522(f).

### III.

The final issue for determination is whether in the consumer context a creditor's purchase money status can be lost. This issue is singularly relevant in bankruptcy. If a creditor has a purchase money security interest, a consumer debtor cannot use 11 U.S.C. § 522(f) to avoid the lien because § 522(f) only avoids nonpurchase money security interests. If a creditor's security interest is transformed into a nonpurchase money security interest, however, then the debtor could use § 522(f) to avoid the lien. This issue also has broad ramifications in the everyday commercial setting, and a careful analysis of the issue is therefore required.

The seminal cases discussing this issue are: *In Re Manuel*, 507 F.2d 990 (5th Cir.

1975); *In Re Staley*, 426 F.Supp. 437 (M.D. Ga.1977); *In Re Norrell*, 426 F.Supp. 435 (M.D.Ga.1977); *In Re Jackson*, 9 UCC Rep. Serv. 1152 (W.D.Mo.1971); *In Re Brouse*, 6 UCC Rep.Serv. 471 (W.D.Mich.1969); *In Re Simpson*, 4 UCC Rep.Serv. 243 (W.D.Mich. 1966). These cases seem to hold if an item secures any debt other than its own price, then the security interest in that item automatically transforms into a nonpurchase money security interest. See *In Re Coomer*, 8 B.R. 351, 353 (Bkrtcy., E.D.Tenn.1980); *In Re Slay*, 8 B.R. 355 (Bkrtcy., E.D.Tenn. 1980).

The issue arises on a regular basis because of everyday business practices with which we are all familiar. A few examples will illustrate the different forms in which the issues are presented. See generally, Donaldson, An Analysis of Retail Sales Legislation, 19 Rocky Mt.L.Rev. 135, 148 (1947). Often an item is sold on credit, and the seller takes a purchase money security interest in that item. But as is commonly the case, the buyer-debtor has a running charge account and has signed a "cross collateralization" agreement where both the original item and items later purchased are security for payment of the whole account balance. Thus each item secures a debt other than its own price, and both the security interest in the original item purchased, *In Re Manuel, supra; In Re Trotter*, 12 B.R. 72 (Bkrtcy., C.D.Calif.1981), and the security interest in the later item purchased, *In Re Norrell, supra*, are transformed into nonpurchase money interests. See generally, Note, The Value of "Value" in a Purchase Money Security Interest, 28 Baylor L.Rev. 667, 671–81 (1976). The situation is similar when a lending institution makes a loan and takes a security interest in an item purchased with the loan proceeds (a purchase money loan), and later adds on debt or cross collateralizes.

The problem also arises when, in addition to the price of the item purchased, the collateral secures such add on costs as sales tax, delivery charges, installation charges, extended warranty coverage, credit life insurance and expenditures necessary to col-

lect the secured debt such as repossession costs or attorney's fees. In each case, some courts have argued the collateral secures a debt other than its own price and therefore the security interest is transformed into a nonpurchase money interest. See McLaughlin, "'Add On' Clause" in Equipment Purchase Money Financing: Too Much of a Good Thing," 49 Fordham L.Rev. 661, 662–63 (1981) [hereinafter McLaughlin, "'Add On' Clauses"].

Four sweeping ramifications of such a transformation are apparent. First, in states where no filing is necessary to perfect a purchase money security interest in consumer goods, the creditor who did not file and later loses purchase money status becomes unperfected, see UCC § 9–302, and loses in a priority dispute to other secured creditors who perfected, see UCC § 9–312(5), and to the trustee in bankruptcy. See 11 U.S.C. § 544.

Second, in states such as Kansas where filing is required to perfect purchase money security interests in consumer goods, Kan. Stat.Ann. § 84–9–302 (Supp.1980), and in all other situations where filing is necessary to perfect, a creditor who obtained the "super priority" status offered under UCC § 9–312(3) and § 9–312(4) will lose that priority. Therefore the second effect is to jumble priorities among creditors, and to defeat the very reasons for having a priority system, namely:

(1) to provide commercial certainty so that,

(c)reditors ... know with precision what their rights are relative to the collateral ... B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code par. 3.1(2)(a)(1980);

(2) to protect the reliance interest of other creditors, so all creditors know where they are seeded in the order of priority. Id. at par. 3.1(2)(c);

(3) to encourage the flow of commerce. Id. at par. 3.1(2)(d);

(4) to promote a policy of fairness. Id. at par. 3.1(2)(f).

See generally, "Special Project—The Priority Rules of Article 9," 62 Cornell L.Rev. 834 (1977); Jackson & Kronman, "Secured Financing and Priorities Among Creditors," 88 Yale L.J. 1143 (1979).

Third, purchase money security interests are not given preferred status to benefit only the creditor. Rather,

(t)he purchase money priority rule encourages the acquisition of new assets by the debtor, ... It is illogical for the Code on the one hand, to encourage the making of the sale by entitling the seller to purchase money priority, but on the other hand, not to permit the purchase money priority to include all sales related charges ... ,

or to take away purchase money status when the debtor is aided in acquiring additional new assets. If the creditor's interest is transformed and purchase money status is lost,

the sale will be discouraged rather than encouraged, and the Code policy of purchase money priority will be undermined. McLaughlin, "'Add On' Clauses," 48 Fordham L.Rev. 670–71.

Finally, once purchase money status is lost, a consumer debtor in bankruptcy may be able to avoid the security interest under 11 U.S.C. § 522(f). The legislative history, however, indicates § 522(f) was not intended to be used by consumer debtors in such a manner:

Frequently, creditors lending money to a consumer debtor take a security interest in all of the debtor's belongings, and obtain a waiver by the debtor of his exemptions. In most of these cases, the debtor is unaware of the consequences of the form he signs.

\* \* \* \* \* \*

The exemption provision allows the debtor, after bankruptcy has been filed ... to undo the consequences of a contract of adhesion, signed in ignorance, by permitting the invalidation of nonpurchase money security interests in household goods. Such security interests have too often been used by over-reaching creditors. The bill eliminates any unfair

*advantage creditors have. H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 127 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6088.*

See also Hearings on H.R. 31 and 32, Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 1st and 2nd Sess., ser. 27, pt. 2, at 758–63 (1975–76) (statement of David H. Williams, Attorney, Division of Special Projects, Bureau of Consumer Protection, Federal Trade Commission), reported in H.R.Rep.No.95–595, 95th Cong., 1st Sess., Appendix 1, 166–173 (1977) U.S.Code Cong. & Admin.News 1978, pp. 6127–6134. Thus Congress enacted § 522(f) to allow the consumer debtor *to avoid security interests in their already owned, used household goods, In Re Coomer, supra,* at 354, and not security interests in collateral which the money advanced was used to purchase.

Perhaps realizing these sweeping ramifications, courts endeavored to carve out exceptions to preserve purchase money status. Where a method was provided to tell when the price on each item of collateral was fully paid, the security interest in each item could terminate as soon as the purchase price was paid. Thus, *the collateral . . . secured only debt representing its price,* and purchase money status was not lost. *In Re Staley, supra,* at 438. A method of paying off the purchase price could be provided for in the security agreement, *In Re Staley, supra,* or by statute such as the Uniform Consumer Credit Code, K.S.A. § 16a–3–302 to 303 (1974). *In Re James,* 7 B.R. 73 (Bkrtcy., D.Me.1980). See also *In Re Mulcahy,* 3 B.R. 454 (Bkrtcy., S.D.Ind.1980); *In Re Mid Atlantic Flange Co.,* 5 B.C.D. 693 (E.D.Pa.1979), both implying the First In First Out (FIFO) payment method of the Uniform Consumer Credit Code would provide a satisfactory method of payoff and thus preserve purchase money status.

Other exceptions also were developed. Some courts said transformation occurred only in the sale and financing of consumer goods, and not in the business or commercial context. *In Re Mid Atlantic Flange Co., supra,* at 695. Other courts preserved purchase money status where a purchase money security agreement contained a clause providing for future advances that was never exercised. *Meadows v. Household Retail Services, Inc.,* 9 B.R. 880, 881 (Bkrtcy., N.D.Ga.1981). Still other courts were willing to find no transformation if loans were consolidated, but no payments were made. *In Re Slay,* 8 B.R. 355, 358 (Bkrtcy., E.D.Tenn.1980).

Other courts, however, made it even harder to preserve purchase money status by holding when a purchase money loan is renewed or consolidated, purchase money status is lost. *In Re Bechen,* 11 B.R. 939 (Bkrtcy., D.S.D.1981); *In Re Krulik,* 6 B.R. 443 (Bkrtcy., M.D.Tenn.1980); *In Re Jones,* 5 B.R. 655 (Bkrtcy., M.D.N.C.1980). But see *In Re James,* 7 B.R. 73 (Bkrtcy., D.Me.1980).

This Court cannot agree with a transformation rule, because it defeats the purpose of having a uniform system of priorities, discourages advancing money to consumer debtors to acquire new assets, and is improper when used by a consumer debtor to avoid a lien under § 522(f) as discussed above. Also, the Court finds that the rule is contrary to existing case law, potentially sets up two different systems of priorities, one in bankruptcy and the other in nonbankruptcy cases, and ignores the express provisions of the Uniform Commercial Code.

First, as this Court held in Part II of this opinion, when notes are renewed or consolidated, or renewed coupled with the granting of additional credit, cash advances, or collateral, the original notes and security interests are not extinguished, absent the intent to make a novation. This Court, the court in *In Re James,* 7 B.R. 73, 75 (Bkrtcy., D.Me.1980), and the weight of authority, reject the argument that the execution of a renewal note extinguishes the prior security interest. See also McLaughlin, " 'Add-on' Clauses," 49 Fordham L.Rev. at 683–84, n. 103.

Second, it could be argued cases such as *In Re Manuel* merely hold that when a creditor cross collateralizes and "adds on", the *filing exemption* for a *consumer goods* purchase money security interests does not

apply. In Kansas, there is no such exemption and creditors with security interests in consumer goods must file to perfect under K.S.A. § 84–9–302. Therefore it is arguable the holding in *In Re Manuel* is inapplicable to a Kansas transaction.

■ Third, this Court does not agree with the court in *In Re Mulcahy*, 3 B.R. 454 (S.D.Ind.1980) when it said:

> The court leaves to Indiana tribunals the question of the exact nature of a security interest such as the one at bar in context other than bankruptcy. *Id. at 459.*

Absent specific congressional legislation to the contrary, the rules applicable to priorities in commercial law must be consistent whether in the context of bankruptcy or everyday commercial transactions (as a point of fact, this Court could not find one nonbankruptcy case that transformed purchase money status). Indeed, the Bankruptcy Code is designed to interact with the Uniform Commercial Code:

> Commercial financing has undergone significant changes since the nearly universal adoption of the Uniform Commercial Code in the 1960's. The Bankruptcy Act has not yet been revised to account for the changes in the industry. The bill modernizes bankruptcy law in its interaction with commercial financing, the areas of preferences and protection of both the debtor and secured creditors during a bankruptcy case.

H.R.Rep.No.95–595, 95th Cong., 1st Sess. 5 (1977) U.S.Code Cong. & Admin.News 1978, p. 5966. Fourth, under pre-Code law, *the majority rule permitted even debts unrelated to the sale to be secured by the item sold.* McLaughlin, " 'Add-On' Clauses," *supra*, at 671, and cases cited in note 44.

Fifth, this Court notes none of the Federal Circuit Courts except the Fifth Circuit have had occasion to adopt the transformation rule, and thus the Tenth Circuit has never embraced such a rule.

Sixth, nowhere in the Uniform Commercial Code is it said a purchase money interest is transformable. In cold hard fact, U.C.C. § 9–107, which defines the term "purchase money,"

makes a security interest purchase money *to the extent* the collateral secures its price or purchase money. There is no requirement in the definition that the secured party intend that an item secure only its purchase money.

\* \* \* \* \* \*

*Section 9–107(a) does not completely exclude the seller's purchase money security interest . . .*

*Likewise, there is nothing in Section 9–107(b) that says that a lender who makes a partly purchase money loan cannot have a partly purchase money security interest.*

*In re Coomer, 8 B.R. 351, 353–54 (E.D. Tenn.1980).*

See Uniform Commercial Code Commentary & Law Digest ¶ 9–107(A)(6)(C) (Supp. 1980). The § 9–107 preamble,

> requires a division of the collateral into two parts—the purchase money collateral . . . and the non-purchase money collateral, the other assets.

McLaughlin, " 'Add-On' Clauses," *supra*, at 691.

Cases like *In Re Simpson,*

> totally disregarded the 'to the extent' preamble to section 9–107(a). This language implies that a secured obligation may have both a purchase money part and a non-purchase money part. McLaughlin, " 'Add-On' Clauses", *supra at 679.*

And, if the court in *In Re Manual, supra,*

> had accepted the 'to the extent' preamble, it could have found that the seller had a purchase money security interest in the furniture to the extent that it secured its price. *Id. at 696.*

■ The only way the preamble *to the extent* can be given meaning is to find that a secured debt may *be split into two parts, a purchase money part constituting so much of the debt as represents the price of the* [collateral] *. . . and a nonpurchase money part constituting the 'add on' debt. Id. at 678. See generally, id. at 678–80.*

In the context of construing § 9–107, the Court notes the Uniform Commercial Code should be *liberally construed and applied to promote its underlying purposes and policies*, K.S.A. § 84–1–102(1) (1965), namely,

(a) *to simplify, clarify and modernize the law governing commercial transactions;*

(b) *to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; . . .* Id. at (2).

It is only by recognizing a secured obligation may have both a purchase money part and a nonpurchase money part that the underlying purposes and policies of the UCC are promoted. This is *the solution that comports most readily with general business practice and understanding.* McLaughlin, " 'Add-On' Clauses," *supra*, at 669.

■ In light of all these considerations, the Court rejects the transformation rule.

The only problem confronting a court is determining the extent of the purchase money interest. The extent of the interest can be proved through use of a method of payoff where purchase money security interests are retired as the price of the collateral is paid off. In consumer cases where the *seller* is extending credit, the Uniform Consumer Credit Code (U3C) provides a First In First Out payment method, and retires the security interest when the purchase price is paid. See K.S.A. § 16a–3–302 to 303 (1974). That provision only applies to sellers, however, and not to finance companies or unrelated assignees of sellers. See K.S.A. § 16a–3–302 (1974). In cases where the U3C is not applicable, the security agreement can provide a method to retire security interests in collateral as the purchase money of each item of collateral is paid.

Absent statutory or contractual methods of payment, this Court can provide a judicial method of determining how much of the debt is purchase money and how much is not. A pro rata method of allocation has been attacked as unconscionable, at least in the consumer context. See *Williams v.*

*Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C.Cir.1965); *In Re Jackson*, 9 U.C.C.Rep. Serv. 1152, 1157–58 (W.D.Mo.1971), and:

The general rule is that in the case of a running account, where the parties have not applied the payments to particular items, the court will apply them to the extinguishment of the earliest items of indebtedness. 70 C.J.S. Payment § 72(b) (1951), and cases cited therein.

The holdings of *Manual, Norrell*, and *Staley* are especially ironic in light of this general rule and *J. M. High Co. v. Arrington*, 45 Ga.App. 392, 165 S.E. 151 (1932) where the court said if neither the debtor nor the creditor provide a method to apply payments to retire debts and collateral securing the debts,

the law will direct the application in such a manner as is reasonable and equitable . . . As a general rule, the oldest lien and the oldest item in an account will be first paid . . . Id.

Recent cases adopting this rule are numerous. See, *e.g.*, *Luksus v. United Pacific Ins. Co.*, 452 F.2d 207, 209 (7th Cir. 1971); *Holt v. Western Farm Services, Inc.*, 110 Ariz. 276, 517 P.2d 1272 (1974); *General Electric Co. v. Central Surety and Insurance Corp.*, 43 Cal.Rptr. 48, 232 C.A.2d 590 (1965); *General Electric Co. v. E. Fred Salzer & Co.*, 86 N.J.Super. 520, 207 A.2d 346, 362 (1965), aff'd. 92 N.J.Super. 210, 222 A.2d 655 (1966). Furthermore, Kansas has adopted the First In First Out general rule in *State v. United States Fidelity & Guaranty Co.*, 81 Kan. 660, 674, 106 P. 1040 (1910), and *Shellabarger v. Binns*, 18 Kan. 345 (1877). Under this general rule, the seller or financing entity should be able to meet the burden of tracing, even absent an apportionment formula in the security agreement or absent application of the U3C. Cf. McLaughlin, " 'Add-On' Clauses," *supra*, at 691.

■ Therefore, this Court finds, in the interests of equity, preserving the systems of priorities, carrying out congressional intent, and promoting commercial certainty and uniformity and in the absence of con-

tractual or statutory provisions, that it will follow the general rule and impose a judicial First In First Out method of payment to retire the purchase money security in collateral as the purchase money of each item of collateral is paid, and thus preserve purchase money status.

One further problem exists. The U3C specifically extinguishes the security interest when the purchase price of an item is paid, K.S.A. § 16a–3–303(1) (1974), but only when the party extending credit is a seller who sells to consumers. Entities other than sellers that extend credit to consumers are not prohibited from retaining a security interest in items even after the purchase price of the item is paid. Though the Court can see no logical reason why lenders other than sellers who sell to consumers are treated differently under the U3C, nevertheless a finance company who cross collateralizes is allowed to retain a security interest in an item even after the purchase price of the item is paid. This is the law in Kansas; this is the arrangement for which the finance company has bargained; and thus a finance company or any other "non-seller of items to consumers" lender should not be required to retire security interests in collateral as the purchase price of the collateral is paid.

■ Therefore it is this Court's holding, in giving effect to the *to the extent* preamble of K.S.A. § 84–9–107(b) (1965), that under a cross collateralization agreement not subject to K.S.A. § 16a–3–303(1), a lien is a purchase money lien until the purchase price of the item is paid (applying a First In First Out method of payment allocation). When the purchase price is paid, the lien becomes a nonpurchase money lien securing debts owed on other items pursuant to a cross collateralization agreement.

### IV.

The effect of the conclusions reached by the Court is hereafter set forth on a case by case basis. It should be noted that the amount specified as owed by each debtor is a maximum, and later may be reduced at a hearing or by agreement concerning the

actual value of the collateral under § 506(a) or § 524(c) and (d). The issue of collateral valuation was not presented during these proceedings.

*In Re Gibson*, Case No. 81–40359. A series of nonpurchase money loans were made by the creditor to the debtor with renewal notes executed.

■ The parties executed one renewal note *after* the effective date of the Code. On August 7, 1980 a renewal note of $1,598.31 was executed; $1,233.41 was carried over from the prior pre-effective date note, and an additional $364.90 was advanced to the debtor. No new collateral was pledged. On August 7, 1980 the parties also executed a "Master Loan Agreement" providing a maximum credit line of $1,600.

The Court, after reviewing the evidence finds the Master Loan Agreement insufficient to show the parties, by the August 7, 1980 renewal, intended a novation. Therefore, the Court holds the secured lien on the debtor's collateral attaching before the effective date of the Code in the amount of $1,233.41 constitutionally cannot be avoided by the debtor. The Court further holds the secured lien for the balance of the debt owed attached after the effective date of the Code and can be avoided by the debtor under § 522(f).

*In Re Hilton*, Case No. 81–10235. A pre-effective date note with an outstanding debt of $1,387.18 was renewed after the Code's effective date, and an additional advance of $777.00 was made. No new collateral was pledged, however, and thus the additional advance was not secured by a purchase money security interest because the advance was not used to purchase any new collateral in which the creditor took a security interest. The debtors made $832.17 in payments after renewal and before bankruptcy was filed. The loans were made in New Mexico and New Mexico has adopted the U3C, but because the creditor is a finance company the provisions of the U3C providing a First In First Out method of repayment are inapplicable. No method of payment was provided in any of the

agreements. Applying a judicial First In First Out method of payment, the $832.17 paid by the debtors reduced their pre-effective date obligation to $555.01, which cannot be avoided. All other obligations attaching after the effective date of the Code are secured by nonpurchase money security interests and can be avoided by the debtors under § 522(f). Therefore, the Court holds the debtors can avoid all liens attaching to the collateral except a lien in the amount of $555.01.

*In Re Wolfe*, Case No. 81–40301. A series of loans were made by the creditor to the debtor with renewal notes executed, additional advances made and additional collateral pledged.

The parties executed one renewal note *after* the effective date of the Code. On October 24, 1979 a renewal note of $8,000 was executed; $6,233.88 was carried over from the prior pre-effective date note, and an additional $1,766.12 was advanced to the debtor. New collateral was pledged.

The Court, after reviewing the documents, finds no evidence the parties intended a novation. Therefore the Court holds the secured lien on the debtor's collateral attaching before the effective date of the Code in the amount of $6,233.88 cannot be avoided by the debtor.

 The Court further finds the parties have stipulated that of the additional collateral pledged, the following was purchased by the debtor with cash advances made by the creditor after the effective date of the Code, and therefore is subject to purchase money security interest:

1979 King size bed
1979 Bar and 2 stools
1979 Coffee and end tables
1979 Love seat and chair
1979 Tilt-top table

The Court finds the U3C §§ 16a–3–302 to 303 inapplicable because the creditor is not a seller, and the Court finds no method of payment provided in any of the agreements to retire purchase money interests as the purchase money of each item of collateral is paid. Therefore, the Court would impose a

First In First Out method of allocation, preserving the purchase money status of the creditor's lien against this collateral, and the debtor cannot avoid liens on these items of collateral under § 522(f) because the liens are not nonpurchase money liens.

The Court finds that other items of collateral were pledged after the effective date of the Code: an 8 place silver setting, a silver wine cooler and 2 silver goblets. These were existing, household goods in which the creditor took a lien, and thus the liens attaching to them are nonpurchase money. The Court therefore holds the debtor may avoid under § 522(f) only the lien attaching to the 8 place silver setting, silver wine cooler and 2 silver goblets.

*In Re Stupka*, Case No. 81–10276. A pre-effective date note with an outstanding debt of $3,800 was renewed after the Code's effective date. No additional advances were made, and no new collateral was pledged. The debtor made one payment of $663.22 leaving a balance of $3,136.78 still owing.

The Court finds the evidence presented insufficient to show the parties intended a novation by their last, post-effective date renewal. Therefore, the Court holds the secured lien on the debtor's collateral in the amount of $3,136.78 constitutionally cannot be avoided by the debtor.

 *In Re Walwyn*, Case No. 81–40613. A post-effective date security agreement secured a $501.63 purchase money advance and a second $548.28 nonpurchase money advance. The U3C is inapplicable because the creditor is not a seller. No method of payment was provided in the security agreement to retire the purchase money security interest in the television as its purchase price was paid. Therefore, the Court would impose a First In First Out method of allocation. The sum of $501.63 of the total $1,049.91 advance was a purchase money advance. In addition, the creditor computed interest of $348.19 due during the life of the note. The debtor has paid $764.60. The parties did not present the Court with evidence of the total amount

due on the television including interest. The Court directs, using a First In First Out method of allocation, that the payments of $764.60 should be applied to retire the principal owed on the purchase money security interest of $501.63 plus interest that accrued on the total note until the date the petition in bankruptcy was filed. Any amount of the purchase money advance not satisfied by this First In First Out allocation method remains a purchase money interest and cannot be avoided under § 522(f). All other advances and liens are nonpurchase money liens in which security interests were taken after the effective date of the Code, and therefore are constitutionally avoided under § 522(f).

*In Re Morrow*, Case No. 81–11147. One loan was made prior to the effective date of the Code. This note was renewed twice after the effective date of the Code, and finally consolidated with another loan.

The Court, after reviewing the evidence, finds no intent to create a novation by the renewals or consolidation. Therefore, the Court holds the secured lien on the debtor's collateral attaching before the effective date of the Code constitutionally cannot be avoided by the debtors.

The creditor, however, had an interest in all equipment, machinery, inventory, accounts receivable, vehicles owned by the debtors at the time of the first note, and after acquired. As of the effective date of the Code, whatever property the debtors owned under these classifications was therefore subject to the creditor's lien. Property the debtors acquired after the effective date of the Code is property the debtors did not have an interest in until after the effective date of the Code, and therefore also property in which the creditor's security interest did not attach until after the effective date of the Code.

The Court holds the debtor cannot avoid any liens that attached to property the debtors had rights in as of the effective date of the Code. Liens on property that the debtors acquired after the effective date of the Code did not attach until after the effective date of the Code and can constitutionally be avoided by the debtors.

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 752 and Rule 52(a) of the Federal Rules of Civil Procedure.